Filed 6/15/16  Dzhanikyan v. Liberty Mutual Ins. Co. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

|  |  |
|---|---|
| MARI DZHANIKYAN,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>LIBERTY MUTUAL INSURANCE COMPANY, et al.,<br><br>Defendants and Respondents. | B261113<br><br>(Los Angeles County<br>Super. Ct. No. BC492169) |

APPEAL from judgments of the Superior Court of Los Angeles County. Yvette M. Palazuelos, Judge.  Affirmed.

Shegerian & Associates and Carney R. Shegerian for Plaintiff and Appellant.

Jackson Lewis, Yvonne Arvanitis Fossati, Sherry L. Swieca and Sarine C. Sahatjian for Defendants and Respondents.

_____

Plaintiff and appellant Mari Dzhanikyan appeals from the summary judgment entered in favor of her employer, defendant and respondent Liberty Mutual Insurance Company (Liberty Mutual), in her action for wrongful termination in violation of public policy and related causes of action.[1]  We conclude summary judgment was appropriately granted and therefore affirm.  We also affirm the award of attorney's fees in favor of Liberty Mutual, for Dzhanikyan's frivolous pursuit of several Fair Employment and Housing Act (FEHA) causes of action.

## FACTS

Dzhanikyan contends she was terminated from employment as a customer service specialist at Liberty Mutual in retaliation for complaints regarding ethnic origin discrimination and/or harassment.  Liberty Mutual, in contrast, contends that Dzhanikyan was terminated for improper underwriting practices.  Dzhanikyan's complaints and Liberty Mutual's investigation into her underwriting practices appear to have occurred nearly simultaneously.  However, a careful review of the chronology demonstrates that the investigation into Dzhanikyan's practices was independent of her complaints.  Thus, even though there was significant evidence of discriminatory practices at Liberty Mutual, the trial court correctly concluded there was no triable issue of fact that suggested Dzhanikyan's termination was retaliatory.

1.    *Background*

Dzhanikyan is a Caucasian woman of Armenian ancestry and national origin.  She worked for Liberty Mutual from January 1981 through June 28, 2012.  From 2007 through her termination, she had the job title of customer service specialist.  As a customer service specialist, Dzhanikyan's job duties included advising policyholders regarding coverage, providing quotes, binding policies, and soliciting some business leads.  Dzhanikyan spoke Armenian.  She also had strong ties to the Armenian

---

[1]    There are four defendants and respondents:  Liberty Mutual Insurance Company; Liberty Mutual Group Inc.; Ian Markham (Dzhanikyan's supervisor); and Eboni Premmer (one of Dzhanikyan's coworkers).  We use "Liberty Mutual" to refer collectively to all defendants unless the context indicates otherwise.

community.  Because of this, she generated business from many Armenian customers, although she worked with customers of all nationalities.  Some Armenian customers would specifically request to work with Dzhanikyan because of her language skills.

Dzhanikyan worked continuously for Liberty Mutual for 31 years without a single complaint of discrimination or harassment until January 2012.[2]

2.      *2008 Warning*

Although Dzhanikyan generally had high scores in her performance evaluations, she incurred a written warning for substandard performance in applying discounts and file documentation.  In December 2007, the assistant regional service manager then in Dzhanikyan's chain of command reported concerns regarding Dzhanikyan's policy handling.  An investigation was conducted, in which 143 of Dzhanikyan's policies were reviewed.  It resulted in the discovery of 27 incorrect or questionable applications of group discounts, 14 "instances of improper exclusions of the named insured as a driver or operator," and 10 instances of improper recording of customer information.  Dzhanikyan was interviewed regarding the questioned policies.  After the interview, Liberty Mutual concluded that Dzhanikyan had engaged in unethical and substandard performance.  It was determined that she be given a one-time final warning.  Liberty Mutual issued Dzhanikyan a written warning on August 7, 2008.  The warning was for improper application of discounts and substandard performance in clear and accurate file documentation.  Dzhanikyan was warned that additional instances of inappropriate policy management could lead to her termination.[3]

---

[2]      Liberty Mutual offered this as an undisputed fact, supported by evidence.  In response to Liberty Mutual's separate statement, Dzhanikyan stated that this fact was "Disputed," but identified no evidence in support of her dispute.  We therefore treat the fact as undisputed.  (*California School of Culinary Arts v. Lujan* (2003) 112 Cal.App.4th 16, 22.)

[3]      On appeal, Dzhanikyan represents that the investigation leading to the warning was *not* prompted by concerns regarding Dzhanikyan's policy writing and file documentation, but was instead due to Dzhanikyan "writing insurance policies for Armenians."  However, the evidence on which Dzhanikyan relies to support this

3.    *Liberty Mutual's January 2012 Zip Code Policy*

Dzhanikyan was not a sales representative, but was assigned to work with a sales representative, J.C. Ynostroza. She designated Ynostroza as the sales representative on many of the policies she bound. During this time, Dzhanikyan and Ynostroza were under the direct supervision of branch manager Ian Markham. Markham reported to area manager Peter Hong.

In October 2011, Hong sent an e-mail to all people who reported directly to him, including Markham, detailing the loss ratios for all Southern California branches. The loss ratio is the total of losses incurred in claims plus adjustment expenses divided by the total premiums earned. The Los Angeles office, under Markham's supervision, had the highest loss ratio in the state. Markham received detailed data for all policies for which payouts had been made during the relevant time period; the data included sales representative, policy number, date of accident, loss, and zip code – but not the names of the policyholders involved. Reviewing this data, Markham determined that a large amount of the losses for policies bound by the Los Angeles office had occurred in the same 19 zip codes. He also determined that a large amount of the losses were associated with policies written by Ynostroza. Indeed, losses associated with Ynostroza's policies were nearly $700,000 higher than the combined losses of all other sales representatives in the office. After reviewing the individual policies, Markham learned that Dzhanikyan had bound many of those policies.

Because the high losses appeared to be related to 19 particular zip codes, at Hong's direction, Markham developed a protocol by which, prior to quotes for policies in

proposition was an e-mail to which Liberty Mutual objected. The court tentatively sustained this objection. At the hearing on the summary judgment motion, Dzhanikyan's counsel specifically raised this tentative ruling and argued against it. The court ultimately adopted the ruling from its tentative. On appeal, Dzhanikyan makes no argument that the court erred in its evidentiary ruling. We therefore treat the evidence as properly excluded. Thus, no admissible evidence supports Dzhanikyan's suggestion that the 2008 investigation and warning were ethnically biased. In any event, the e-mail in question did not indicate that Dzhanikyan was investigated for writing policies for Armenian policyholders, but for errors she made in policies she wrote for Armenian policyholders.

those zip codes being bound, Markham or a lead customer sales representative would have to review and approve the policy. Although this policy was developed by Markham, it was approved by Hong, Human Resources Generalist Phyllis Scharnick, and a third individual.

Because the policy losses had been associated with policies bound by Dzhanikyan and Ynostroza, Markham spoke with them individually to inform them of the new zip code policy. These meetings occurred on January 10, 2012. On January 18, 2012, Markham announced the zip code policy to the entire Los Angeles office, via e-mail.

Dzhanikyan believed that the 19 zip codes identified in Markham's new policy were areas populated by Armenians, and that Markham's zip code policy was discriminatory. On January 11, 2012, the day after Markham privately told her about the policy, Dzhanikyan sent Markham an e-mail complaining that, despite the fact that Markham had not mentioned race during their meeting, Dzhanikyan now felt nervous taking calls from Armenian customers. Markham assured her that he wanted her to feel comfortable servicing customers regardless of race.

4.    *Coworker Premmer's Instant Message*

On January 13, 2012 – between the day Markham informed Dzhanikyan of the zip code policy and his putting it into effect in the entire office – Dzhanikyan's coworker Eboni Premmer sent Dzhanikyan an improper instant message. Some of the employees had been discussing reality star Khloe Kardashian and her inability to get pregnant. Dzhanikyan volunteered that if Kardashian had seen a particular Armenian fertility doctor, the doctor surely could have helped her get pregnant. Premmer thought Dzhanikyan was boasting that an Armenian doctor could do what no other doctor could. She sent an instant message reading, "here she goes abo[u]t her damn Armenians." Rather than send it to another coworker, however, Premmer inadvertently sent the message to Dzhanikyan.

Dzhanikyan was upset. She complained to Markham about the instant message on the same day. Scharnick (from HR) commenced an investigation. As a result, Premmer received a warning for inappropriate conduct and misuse of corporate resources.

5

5.    *The "Unknown Operator" Investigation Commences*

Within days of the instant message incident, Liberty Mutual conducted another investigation that ultimately impacted Dzhanikyan. In the course of policy underwriting, Liberty Mutual obtains copies of its applicants' motor vehicle reports, listing accident history. Sometimes, an applicant should not be charged with an accident. If the driver of the vehicle at the time of the accident was not the owner of the vehicle or a designated driver on the policy, Liberty Mutual's representative quoting the policy can indicate the accident is attributable to an "unknown operator," i.e. someone who was not an authorized driver under the policy. When this occurs, the accident is disregarded and not considered part of the applicant's record. This impacts the evaluation of risk and may also affect the premium amount.

On January 20, 2012, Hong was informed by Liberty Mutual's director of state operations that the use of unknown operator status had tripled and that employees may be gaming the system. The director of state operations specifically identified six representatives who should be investigated for their use of unknown operator status. Among the representatives was Ynostroza. That same day, Hong requested that his branch managers, including Markham, review the identified insurance policies (written in mid-2011) in order to ensure that unknown operator status had been properly used.

Markham then met separately with Ynostroza and Dzhanikyan to discuss the use of unknown operators in the identified policies. Ynostroza denied using unknown operator status in any of the policies at issue. Dzhanikyan, in contrast, did not deny using it, but could not recall the reasons why it was used it in those policies.

Unbeknownst to Dzhanikyan, the "unknown operator" investigation continued.

6.    *Early 2012 – Markham's Allegedly Discriminatory Policy Approval Practices*

As noted above, Markham informed all of his employees of the zip code policy on January 18, 2012. Dzhanikyan believed that Markham was targeting Armenians in the way he effectuated the policy. When an employee would seek his approval for a policy in one of the identified zip codes, Markham would approve it instantly if the applicant's

6

last name was not Armenian.  If the customer was Armenian, Markham took over and asked the applicant numerous additional questions.

At one point in 2012, Dzhanikyan sought Markham's permission to establish a group discount for an Armenian church.  Markham rejected it, stating, "Huh, Armenians.  Do we want more Armenian business?  We don't want to grow our Armenian book of business."

Dzhanikyan also believed Markham was keeping a closer eye on Dzhanikyan with regard to her Armenian clients.  When other employees would refer an Armenian customer to her, they would do so by an e-mail copied to Markham.  Dzhanikyan believed Markham was asking the other employees to watch her Armenian calls.

Dzhanikyan would not complain about these practices until March 2012.

7.    *The February 2012 Staff Meeting*

In February 2012, Dzhanikyan attended a staff meeting, which was also attended by her coworkers and led by Markham.  Neither area manager Hong, nor HR's Scharnick, the two employees who were conducting the internal investigation into the questionable use of unknown operator, attended.  At the meeting, some of Dzhanikyan's coworkers, including Premmer, mocked Armenian accents and said Armenians customers lied.  Specifically, the coworkers were talking about what the Armenian customers would do without Dzhanikyan.  Her coworkers joked that the Armenian customers might lie to get through to Dzhanikyan, by saying they were her personal friends.  Markham did nothing to stop this and laughed while the other employees mimicked Armenian accents.

8.    *The Results of the "Unknown Operator" Investigation*

During this time, Hong was attempting to determine who had actually used the unknown operator designator in the policies at issue.  Hong ordered iteration data, which identifies which person input each piece of data into Liberty Mutual's computer system.  On February 22, 2012, he received the iteration data, which showed Dzhanikyan was responsible for changing the field in the computer system to "unknown operator" on 18

7

policies.**4** A detailed review of the policies confirmed that the use of unknown operator status was improper in each instance, and that surcharges should have been applied to the premiums of 6 of the 18 policies. Hong then discussed his results with Scharnick; together they determined to conduct a factfinding investigation to determine why Dzhanikyan had made these unwarranted policy changes.

9.     *The March 2, 2016 "Unknown Operator" Interview*

On March 2, 2016, Dzhanikyan was interviewed about her use of unknown operator status. Four individuals conducted the interview: Markham, Hong, Scharnick, and area director for field administration, Michael Silvestri. Only Markham and Silvestri were present in the room with Dzhanikyan; Hong and Scharnick attended by telephone. In the interview, Dzhanikyan could not recall the reasons for some of the changes; she stated others were mistakes.

Dzhanikyan terminated the interview because she was not feeling well. She also felt intimidated by Liberty Mutual's use of four interviewers.

10.     *Dzhanikyan's March 5, 2016 and March 6, 2016 Complaints*

On March 5, 2016, after the interview regarding her misuse of the unknown operator designation, Dzhanikyan e-mailed Markham, copying Hong and Scharnick. In her e-mail, she stated she intended to retire due to a hostile work environment, specifically mentioning her coworkers' comments at the February 2012 staff meeting. In a follow-up, sent only to Hong and Scharnick, Dzhanikyan complained that Markham's zip code policy was primarily used to target the Armenian population. On March 6, 2012, Dzhanikyan added, in an e-mail only to Scharnick, that the March 2 interview had been unprofessional and humiliating.

Scharnick commenced an investigation into Dzhanikyan's allegations. She concluded Dzhanikyan's claims were unsubstantiated.

---

**4**     In her reply brief on appeal, Dzhanikyan suggests for the first time that someone else may have used her customer service number to enter the unknown operator information on the policies. Yet, Dzhanikyan never denied that she had changed the applications to indicate unknown operator – not during Liberty Mutual's investigation, not at her deposition, and not in her declaration in opposition to summary judgment.

8

11. *The May 8, 2012 "Unknown Operator" Interview*

The continued interview of Dzhanikyan on her improper use of unknown operator status took place on May 8, 2012. Again, the only explanation Dzhanikyan offered was that she had made mistakes. She never denied changing the data.

12. *The Termination Decision*

According to Liberty Mutual, Scharnick and Hong made the decision to recommend Dzhanikyan's termination, due to her second policy writing offense. According to Dzhanikyan, Markham had input on the decision, and she argues the decision was made in part due to her complaints and her "unwillingness to cease signing up Armenian policy holders."

On May 18, 2012, Scharnick had a conference call with field HR Manager Richard Champagne and three others (not including Markham or Hong). They discussed the results of the "unknown operator" investigation, and it was determined that Dzhanikyan had violated Liberty Mutual's data integrity policy. Scharnick e-mailed Champagne, transmitting the investigation documents and a "Termination Approval" form. She sought approval to terminate Dzhanikyan for cause, based on Dzhanikyan's violation of Liberty Mutual's policies.

At Liberty Mutual, when a decision is made to terminate an employee with over ten years of tenure, approval must be obtained from multiple corporate individuals. Champagne reviewed Scharnick's paperwork, concluded termination was appropriate, and forwarded the materials to the proper channels. All of the other necessary individuals approved the termination. At Champagne's deposition, he identified eight people, including himself, and not including Hong, Scharnick or Markham, who agreed to terminate Dzhanikyan. Nobody other than the eight identified individuals participated in the final decision to terminate Dzhanikyan's employment.

13. *Markham Informs Dzhanikyan of the Termination*

On June 28, 2012, Markham told Dzhanikyan she was terminated.  Afterward, he told Dzhanikyan that he was relieved that she would be gone because she "was causing trouble around the office with [her] complaints and Armenian customers."**5**

## PROCEDURAL BACKGROUND

1. *The Complaint*

On September 17, 2012, Dzhanikyan brought suit against Liberty Mutual, Markham and Premmer, alleging 12 causes of action.  Seven causes of action alleged violations of FEHA's prohibitions against discrimination, harassment, and retaliation; two additional causes of action alleged violations of the California Family Rights Act.  Each of these nine causes of action was ultimately dismissed; none of them are before this court.  The remaining three causes of action – the ones at issue now – are for wrongful termination in violation of public policy; intentional infliction of emotional distress; and breach of contract not to terminate without good cause.  However, it is necessary to discuss the circumstances of the dismissal of the FEHA causes of action, as that dismissal led to the attorney's fee award challenged on appeal.

2. *The Motion for Summary Judgment*

On July 19, 2013, Liberty Mutual filed its motion for summary judgment.  As to the FEHA causes of action, Liberty Mutual argued that Dzhanikyan had failed to properly exhaust her administrative remedies.  Liberty Mutual also argued, at great length, that all of Dzhanikyan's causes of action failed on the merits because Liberty Mutual terminated Dzhanikyan's employment for the legitimate reason of her poor policy writing practices.

3. *The Dismissal of Dzhanikyan's FEHA Causes of Action Preliminary to the Attorney's Fee Award*

After Liberty Mutual charged that her administrative complaints were insufficient, Dzhanikyan attempted to correct the problem by filing amended administrative complaints with the Department of Fair Employment and Housing.  However, in two of

---

**5** Liberty Mutual did not dispute Markham's parting comment in their summary judgment papers.  Instead, Liberty Mutual argued the fact was "immaterial."

10

those three amended administrative complaints, Dzhanikyan falsely claimed that the most recent act of alleged discrimination took place on June 28, 2013, instead of 2012.

Without waiting for resolution of its summary judgment motion, Liberty Mutual moved to have the FEHA causes of action stricken, under Code of Civil Procedure section 128.7, as having been frivolously pursued. Liberty Mutual also sought its attorney's fees as a sanction under the same statute. On January 8, 2014, the trial court ordered the FEHA causes of action stricken, as having been pursued in bad faith. The court denied attorney's fees without prejudice. The court concluded that a sanction under section 128.7 may be imposed only to deter future misconduct, and believed monetary sanctions were not necessary to accomplish that goal.

After the trial court dismissed Dzhanikyan's FEHA causes of action, Dzhanikyan attempted to file similar federal claims for discrimination in federal court. Liberty Mutual renewed its motion for attorney's fees as Code of Civil Procedure section 128.7 sanctions, on the theory that Dzhanikyan's federal filing showed that she was undeterred by the mere sanction of dismissal. The trial court denied the motion for attorney's fees on the basis that it could not award sanctions under section 128.7 for documents filed in federal court.

4.    *The Award of Attorney's Fees*

On July 1, 2014, Liberty Mutual moved for its attorney's fees – not as a sanction, but as prevailing party on the FEHA causes of action, under Government Code section 12965. That statute provides that a prevailing defendant in a FEHA action may be awarded attorney's fees under certain circumstances. Liberty Mutual argued that it was entitled to attorney's fees given the trial court's finding, in connection with the dismissal under Code of Civil Procedure 128.7, that the FEHA causes of action had been pursued in bad faith. Liberty Mutual sought its fees only for the period between its motion for summary judgment and the dismissal of the FEHA causes of action, and only five-eighths of its fees incurred over that time, as there were then eight causes of action pending, of which five were FEHA causes of action.

11

Dzhanikyan opposed the motion on two bases only. First, she argued that the motion was premature, as there was no judgment (the motion for summary judgment had not even been heard), so legally there was no prevailing party. Second, she argued that the motion was simply a restatement of the prior motion for attorney's fees which had been twice denied. Dzhanikyan made no argument that her FEHA causes of action were not, in fact, frivolously pursued. Nor did she argue against Liberty Mutual's calculation of the amount of fees. Specifically, she made no argument that all or most of the fees incurred by Liberty Mutual would have been incurred in connection with her wrongful termination cause of action even if her FEHA causes of action had never been brought.

The trial court tentatively granted the motion for fees, but sought additional briefing on whether any fee award should be stayed pending the resolution of the litigation. Following the briefing, the court awarded Liberty Mutual its fees in the amount of $78,681, with payment stayed until termination of the lawsuit. The court found that Dzhanikyan's counsel had pursued the FEHA causes of action in an objectively unreasonable manner, in that, even after it became clear that the FEHA causes of action were administratively barred, counsel had nevertheless continued to prosecute those claims with numerous discovery requests "aimed at uncovering information primarily related to the FEHA claims." (CT 1502) Finding that Dzhanikyan's continued prosecution of the claims was "harassing, frivolous, unreasonable, and groundless," the court concluded an award of fees was appropriate.

5.  *Summary Judgment*

Thereafter, Dzhanikyan opposed the summary judgment motion, arguing that she had raised a triable issue of fact. Specifically, Dzhanikyan relied on evidence that Markham had made discriminatory comments against Armenians, engaged in discriminatory policy writing regarding Armenians, did not step in when Dzhanikyan's coworkers were mocking Armenians, and told Dzhanikyan that he was glad she was leaving because she had been causing too much trouble with her complaints and Armenian customers. Dzhanikyan argued that a triable issue of fact existed as to whether she was terminated because she had complained – to both Markham and his superiors –

12

about Markham. She argued that even if Markham had not specifically made the termination decision, he had been involved in the investigation and poisoned it with his desire to have Dzhanikyan fired for improper retaliatory reasons.

The trial court granted summary judgment, concluding that Dzhanikyan's evidence did not refute Liberty Mutual's showing of a legitimate nondiscriminatory reason for her termination. This also defeated her cause of action for breach of contract not to terminate without cause. As to intentional infliction of emotional distress, the court concluded Dzhanikyan did not show extreme or outrageous conduct sufficient to establish the cause of action.

6.      *Appeal*

On January 1, 2015 Dzhanikyan filed a notice of appeal, appealing from the November 5, 2014 judgment and the September 4, 2014 attorney's fee award.

## DISCUSSION

We first address the trial court's ruling on summary judgment, then turn to its award of attorney fees.

1.      *Summary Judgment*

A.      *Standard of Review*

" 'A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail.' [Citation.] The pleadings define the issues to be considered on a motion for summary judgment. [Citation.] As to each claim as framed by the complaint, the defendant must present facts to negate an essential element or to establish a defense. Only then will the burden shift to the plaintiff to demonstrate the existence of a triable, material issue of fact. [Citation.]" (*Ferrari v. Grand Canyon Dories* (1995) 32 Cal.App.4th 248, 252.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.) We review orders granting or denying a

13

summary judgment motion de novo. (*FSR Brokerage, Inc. v. Superior Court* (1995) 35 Cal.App.4th 69, 72; *Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 579.)

We exercise "an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law." (*Iverson v. Muroc Unified School Dist.* (1995) 32 Cal.App.4th 218, 222.)

B.      *Wrongful Termination in Violation of Public Policy*

The principal issue presented here deals with Dzhanikyan's cause of action for wrongful termination in violation of public policy. "To the broad principle that an employer may discharge an at-will employee . . . for any reason, or for no reason at all, it is now a well-established exception that an employer may not do so when the discharge violates 'fundamental principles of public policy.' [Citations.] A termination under such circumstances is tortious. [Citation.]" (*Jersey v. John Muir Medical Center* (2002) 97 Cal.App.4th 814, 820.) In this case, Dzhanikyan argues that she was terminated in violation of the public policy, set forth in FEHA, prohibiting retaliation for complaints of discrimination or harassment.[6]

Although the cause of action is for wrongful termination rather than for violation of FEHA itself, the parties litigated, and the court resolved, the cause of action under the standard burden-shifting of a FEHA cause of action. Some authority supports this. (See *Colarossi v. Coty US Inc.* (2002) 97 Cal.App.4th 1142, 1146, 1152.) Under this test, the

---

[6]     FEHA prohibits discrimination in employment and housing; it does not prohibit discrimination in selling auto insurance policies. At no point does Dzhanikyan argue: (1) Markham's zip code policy constituted illegal redlining (cf. Ins. Code, § 11628); (2) her complaints about the zip code policy constituted protected whistleblowing; and (3) her termination violated the public policy protecting whistleblowers. Dzhanikyan identified only FEHA as the public policy her termination violated; in other words, she argued only that she was terminated for complaints that *she* was discriminated against, not that Armenian applicants were. The zip code policy was only relevant to this in the sense that Armenian customers made up the bulk of Dzhanikyan's business; discriminating against her customers would have a negative impact on her book of business.

14

plaintiff initially has the burden to "show (1) [plaintiff] engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action. [Citations.] Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action. [Citation.] If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation ' " 'drops out of the picture,' " ' and the burden shifts back to the employee to prove intentional retaliation. [Citation.]" (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042.) A plaintiff can satisfy this burden with direct evidence, consisting of remarks by decision makers displaying retaliatory motive. A plaintiff may also rely on circumstantial evidence, such as job performance, the timing of events, and how the plaintiff was treated in comparison to other workers. (*Colarossi v. Coty US Inc.,* at p. 1153.)

In this case, Liberty Mutual obtained summary judgment on the basis that, regardless of whether Dzhanikyan could establish a prima facie case, it possessed a legitimate, nonretaliatory reason for the termination, and Dzhanikyan could raise no triable issue of fact of intentional retaliation.[7]

It cannot seriously be disputed that Liberty Mutual possessed a legitimate nonretaliatory reason for the termination. Iteration data established that Dzhanikyan incorrectly used the unknown operator designator in 18 insurance policies written over three months in 2011 – resulting in the loss of premiums in 6 instances and, potentially, an incorrect evaluation of risk in all of them. She had no explanation for her use of unknown operator status in any of the policies, beyond that she made mistakes. This was

---

[7]     Liberty Mutual did not pursue a "mixed motive" defense. Under that defense, when unlawful discrimination was a substantial factor motivating a termination, but the employer proves it would have made the same decision absent such discrimination, a court may not award damages, backpay, or reinstatement (although, in a FEHA cause of action, equitable relief may still be available). (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 211.) As Liberty Mutual did not seek summary judgment on this basis, we do not consider it.

15

not the first time Dzhanikyan had engaged in improper policy writing practices; she had incurred a written warning for similar misconduct in 2008, when she was warned that further instances of inappropriate policy management could result in termination.[8] The termination was approved by eight individuals in Liberty Mutual's hierarchy, all of whom reviewed the evidence of Dzhanikyan's violation of Liberty Mutual's practices – and none of whom were alleged by Dzhanikyan to have had any knowledge of her complaints of ethnic discrimination or harassment.

The real issue in this case is whether Dzhanikyan raised a triable issue of fact that her firing was an act of intentional retaliation. She attempts to do so under the so-called "cat's paw" theory. Generally speaking, when the corporate decision makers who decide to terminate an employee did not know of the employee's complaints, the decision makers could not possibly have acted in retaliation for the complaints. There can be no causal link between the complaints and the decision if the decision makers were unaware of them. (*Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, 107.) But corporate decisionmaking is not always such a simple process, and retaliatory animus may be a but-for cause of the termination, even if the ultimate decision maker was ignorant. (*Id.* at p. 108.) "[T]he point may be easily illustrated. A supervisor annoyed by a worker's complaints about sexual harassment might decide to get rid of that worker by, for instance, fabricating a case of misconduct, or exaggerating a minor instance of misconduct into one that will lead to dismissal. Another manager, accepting the fabricated case at face value, may decide, entirely without animus, to discharge the

---

[8] Dzhanikyan makes much of the idea that her 2008 warning was not for "unethical" conduct, yet Liberty Mutual may have, in retrospect, characterized it as such when considering its impact in 2012. The argument is a red herring. Liberty Mutual had a written "Ethical Conduct Policy," which prohibited employees from making any misrepresentation or untruthful statement on insurance applications. The result was that any entry of inaccurate information into a policy application, even if unintentional, constituted a violation of the Ethical Conduct Policy. Thus, Liberty Mutual's characterization of the 2008 warning as an ethical violation does not necessarily imply Dzhanikyan's conduct was recharacterized as intentionally fraudulent; it simply implies a violation of Liberty Mutual's broad ethical standards.

16

plaintiff. It would be absurd to say that the plaintiff in such a case could not prove a causal connection between discriminatory animus and his discharge. The situation is equivalent to one in which the supervisor simply fires the worker in retaliation for protected conduct. The supervisor's utilization of a complex management structure to achieve the same result cannot have the effect of insulating the employer from a liability that would otherwise be imposed." (*Id.* at pp. 108-109.) In short, under the cat's paw theory, "showing that a significant participant in an employment decision exhibited discriminatory animus is enough to raise an inference that the employment decision itself was discriminatory, even absent evidence that others in the process harbored such animus." (*DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 553.)

Dzhanikyan focuses on evidence relating to Markham only; she does not argue anyone else involved in the investigation resulting in her termination acted with improper retaliatory motive. As to Markham, Dzhanikyan's evidence showed, among other things, that he stated he was happy she was terminated, because she was causing too many problems with her complaints and her Armenian customers. This is sufficient to raise a triable issue of fact that Markham acted with discriminatory or retaliatory animus. However, even considering the cat's paw theory, there is insufficient evidence that Markham was a "significant participant" in the termination decision. Markham did not commence the investigation; it began on January 20, 2012, when Liberty Mutual's director of state operations instructed Hong to investigate Ynostroza's use of the unknown operator designator in certain identified policies.[9] After Markham initially interviewed Ynostroza and Dzhanikyan, it appeared that Dzhanikyan, not Ynostroza, was responsible. But Liberty Mutual did not simply rely on Markham having pointed the finger at Dzhanikyan; instead, Hong ordered the iteration data, which proved Dzhanikyan had made the questioned entries. After the data proved Dzhanikyan had input the

---

**9** At this point, Dzhanikyan had complained only to Markham and only about the zip code policy and Premmer's improper instant message. There is no evidence Hong or the director of state operations had any knowledge of these complaints.

17

unknown operator designators, Hong and Scharnick – not Markham – concluded that the issue must be pursued by an interview with Dzhanikyan. Markham did participate in this interview; he was Dzhanikyan's immediate supervisor, and was present in the room with her while Hong and Scharnick questioned Dzhanikyan by conference call. There is no evidence that Markham directed the interview, said anything which led Dzhanikyan to say anything incriminating, or did anything at all which may have poisoned the process with his own, allegedly improper, motives. The undisputed evidence shows that presence in the March 2 interview – and its continuation on May 8 – was Markham's only involvement in the process. Hong and Scharnick, not Markham, made the decision to move forward and seek Dzhanikyan's termination. Champagne and seven other individuals, not Markham, actually approved it. Markham's involvement in the investigation leading to Dzhanikyan's termination was tangential at best. As such, Dzhanikyan has failed to establish the existence of a triable issue of fact that she was, in fact, terminated in retaliation for her complaints.[10]

At oral argument on appeal, Dzhanikyan took issue with the above analysis, arguing that Liberty Mutual failed to establish that Markham was not a significant participant in the termination decision. We first turn to Liberty Mutual's separate statement of undisputed facts, and Dzhanikyan's response to it. Liberty Mutual offered as an undisputed fact that Scharnick and Hong made the initial recommendation that Dzhanikyan be terminated. Dzhanikyan disputed the fact, stating that the decision to recommend termination had been made with Markham's input. The evidence on which Dzhanikyan relied to support this dispute consisted of two exhibits and a paragraph from

---

[10] Dzhanikyan does not appear to argue that she was retaliated against for the complaints she made to Hong and Scharnick in March 2012. Those complaints were made after the first interview in which it became clear that Dzhanikyan had no explanation for her use of the unknown operator field in several policies. Temporal proximity between the employee's complaints and the termination decision is not sufficient to raise a triable issue of fact, especially "where the employer raised questions about the employee's performance before [the complaint], and the subsequent discharge was based on those performance issues." (*Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 334-335.)

Dzhanikyan's deposition. The exhibits related to the 2008 investigation and had nothing to do with Markham. Even if Dzhanikyan had intended to identify her exhibits pertaining to the 2012 unknown operator interview, those documents showed only that Markham was present at the interview – which, as we have noted above, does not establish that he had input in the termination decision. As to the paragraph of Dzhanikyan's deposition, it set forth the statement Markham made when he informed Dzhanikyan of her termination – that he was pleased she would be gone because she was causing trouble with her complaints and Armenian customers. This statement does not evidence that Markham was involved in the decision to recommend her termination. We therefore treat as undisputed the fact that Scharnick and Hong, without Markham, decided to recommend Dzhanikyan's termination.

Following the termination recommendation of Scharnick and Hong, the decision was submitted to eight individuals (Champagne, Kathy Noren, Jan Dempsey, Sharon Crowley, Tom Jones, John Fedak, Steve McKenna, and Tim Sweeney), who, as Champagne testified, were the only eight people who participated in the actual decision to terminate Dzhanikyan.[11] Although this was not proposed by Liberty Mutual as an undisputed fact, there is simply no contrary evidence in the record that anyone other than those eight was involved in the ultimate decision – and certainly no evidence that Markham was. Indeed, Liberty Mutual had offered as an undisputed fact that Markham never made "a formal request" to terminate Dzhanikyan. Dzhanikyan's response was that the fact was undisputed but immaterial, because "Markham was present at the investigation interview and had input into her termination." The evidence on which Dzhanikyan relied in support of her response, however, was only the interview notes from the 2012 investigation. These notes confirm that Markham was present at the interview, but provide no evidence that Markham had input into Dzhanikyan's termination.

---

[11] Dzhanikyan submitted the entirety of Champagne's deposition in opposition to the summary judgment motion.

19

In short, our review of the record demonstrates that the only evidence of Markham's involvement in the termination decision was his presence at the March 2 and May 8 continued interview of Dzhanikyan. This presence is insufficient to raise a triable issue of fact that he was a significant participant under the "cat's paw" theory.

C.     *Breach of Contract to Not Terminate Without Good Cause*

Dzhanikyan's next cause of action is for breach of contract to not terminate without cause. To have good cause, an employer must have "fair and honest reasons, regulated by good faith on the part of the employer, that are not trivial, arbitrary or capricious, unrelated to business needs or goals, or pretextual. A reasoned conclusion, in short, supported by substantial evidence gathered through an adequate investigation that includes notice of the claimed misconduct and a chance for the employee to respond." (*Cotran v. Rollins Hudig Hall Internat., Inc.* (1998) 17 Cal.4th 93, 107-108.)

Assuming that Dzhanikyan's employment was covered by an implied contract not to terminate without good cause, Liberty Mutual's evidence established good cause existed. Dzhanikyan was terminated for a second policy writing offense, supported by a months-long investigation and a two-part interview wherein Dzhanikyan was given an opportunity to respond. Dzhanikyan's argument that a triable issue of fact exists that there was no good cause is based on the same evidence with which she challenges the termination as being against public policy. Her argument fails for the same reasons.

D.     *Intentional Infliction of Emotional Distress*

" ' "The elements of a prima facie case for the tort of intentional infliction of emotional distress [are] . . . as follows: '(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard [for] the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct.' " [Citation.]' [Citation.]" (*Wilkins v. National Broadcasting Co.* (1999) 71 Cal.App.4th 1066, 1087.) The conduct must be "so extreme and outrageous 'as to exceed all bounds of that usually tolerated in a civilized society.' " (*Ibid.*) Dzhanikyan has failed to identify any conduct which was so extreme and

20

outrageous as to satisfy this test. We acknowledge that some of Markham's actions legitimately upset her. And we do not condone the remarks and conduct at issue, much of which Markham does not deny. Nevertheless, neither by word nor deed did Markham engage in the type of outrageous conduct found in the reported cases. (See, e.g., *Grenier v. Taylor* (2015) 234 Cal.App.4th 471, 477, 486-487 [publicly accusing a pastor of child molestation, drug dealing and drug smuggling is sufficiently outrageous].)

Dzhanikyan suggests that a single offensive act or comment by a supervisor is sufficient for liability. For this proposition, she relies on *Dee v. Vintage Petroleum, Inc.* (2003) 106 Cal.App.4th 30. That case held that a single comment or act by a supervisor may be sufficient to establish a hostile working environment (*id.* at pp. 35-36); it did not hold that such a comment or act would be sufficient to establish intentional infliction of emotional distress.

2.      *Attorney's Fee Award*

Government Code section 12965 authorizes under certain conditions an award of attorney's fees and costs to the prevailing party in any action brought under FEHA. (*Bond v. Pulsar Video Productions* (1996) 50 Cal.App.4th 918, 921 (*Bond*).) A prevailing defendant can obtain costs and attorney's fees under this statute only when the "plaintiff brought or continued litigating the action without an objective basis for believing it had potential merit." (*Williams v. Chino Valley Independent Fire District* (2015) 61 Cal.4th 97, 99-100.) "A trial court's award of attorney fees and costs under this section is subject to an abuse of discretion standard. [Citation.]" (*Bond,* at p. 921.)

Here, the trial court awarded Liberty Mutual a fraction of its attorney's fees, attributable to its defense of the FEHA claims between such time as Dzhanikyan should have known she could not pursue the claims (as her administrative complaints were defective) and the time they were actually dismissed as being pursued in bad faith. Dzhanikyan challenges this order on four bases, none of which are persuasive.

First, Dzhanikyan attempts to distinguish the authority on which the trial court relied in its order, specifically *Bond*. But the issue on appeal is not whether the trial court appropriately applied *Bond*, but whether it abused its discretion. This much is clear: the

21

trial court concluded that Dzhanikyan's continued pursuit of her FEHA causes of action, after it had been shown that they were administratively barred, was "harassing, frivolous, unreasonable, and groundless." This satisfies the necessary standard. Moreover, Dzhanikyan cannot argue that the court erred in making this determination, as she did not argue against Liberty Mutual's motion for fees on that basis. (*Ford Motor Credit Co. v. Hunsberger* (2008) 163 Cal.App.4th 1526, 1531.)

Second, Dzhanikyan argues that the discovery she conducted on her FEHA claims was equally related to her wrongful termination in violation of public policy cause of action, so the court should not have awarded Liberty Mutual its fees attributable to responding to this discovery. Yet this argument, too, is barred, as Dzhanikyan failed to raise it in opposition to Liberty Mutual's motion for fees. Indeed, in opposition to Liberty Mutual's motion, Dzhanikyan did not challenge the amount of fees sought at all.

Third, Dzhanikyan argues that, at the time of the attorney's fee award, Liberty Mutual was not the prevailing party. While this may be true, Liberty Mutual was the prevailing party on the FEHA causes of action; the court stayed the award of fees until the termination of the action; and Liberty Mutual ultimately prevailed on the entire case. While the award of fees may have been premature (an issue we need not address), the eventual resolution of the case defeats any error in the prematurity of the award.

Fourth, Dzhanikyan argues the award of fees was an abuse of discretion in that the trial court had twice denied Liberty Mutual attorney's fees and Liberty Mutual should not have been granted a third bite at the apple. But Liberty Mutual was first denied fees, without prejudice, when it had sought those fees as a sanction under Code of Civil Procedure 128.7. When Liberty Mutual sought renewal of its sanction motion due to Dzhanikyan's actions taken in federal court, the trial court again denied the section 128.7 fees. Liberty Mutual then sought, and was granted, its fees under Government Code section 12965. This was a different statutory basis with a different purpose and different standard. An attorney's fee award might not have been warranted as a sanction, but was justified as an award to the prevailing party when the FEHA causes of action had been frivolously pursued.

22

**DISPOSITION**

The judgment and attorney's fee award are affirmed.  Liberty Mutual is to recover its costs on appeal.


RUBIN, ACTING P. J.

WE CONCUR:


FLIER, J.


GRIMES, J.